UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                           Case No. 17-cr-20363-4

v.                           Hon. Matthew F. Leitman

D4, FAZULLAH KHAN,

    Defendant.

_____/

### OPINION AND ORDER (1) DENYING DEFENDANT FAZULLAH KHAN'S MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (ECF No. 170) and (2) DENYING CERTIFICATE OF APPEALABILITY

On July 12, 2019, a jury in this Court convicted Defendant Fazullah Khan of four counts of bribery in violation of 18 U.S.C § 666(a)(2). (*See* Verdict Form, ECF No. 104, PageID.2435.)  United States District Judge Robert Cleland then sentenced Khan to serve 132 months in custody. (*See* Judgment, ECF No. 150.)  The Sixth Circuit affirmed Khan's conviction and sentence on direct appeal. *See United States v. Khan*, No. 20-1179, 2021 WL 4026781 (6th Cir. Sept. 3, 2021).  Khan has now returned to this Court and filed a motion to vacate his sentence under 28 U.S.C. § 2255. (*See* Mot., ECF No. 170.[1])  For the reasons explained below, Khan's motion is **DENIED**.

---

[1] Khan filed two versions of the motion: a sealed, unredacted version (ECF No. 170) and an unsealed, redacted version (ECF No. 171).  To the extent that ECF No. 171

1

# I

## A

The Sixth Circuit set forth the factual background of this case as follows:

> In 2008, Dan O'Leary was elected supervisor of Washington Township after running on an anti-corruption platform. After taking office, an audit of the town's municipal departments revealed to O'Leary that someone in the Public Works Department had intentionally drawn sewage lines to increase specific property values. Steve Hohensee oversaw the Public Works Department, and O'Leary had already been suspicious of Hohensee based on rumors that Hohensee was involved in public corruption. Sometime later, Mike Magnoli, a local real estate developer, told O'Leary that he was "being muscled" by Hohensee to facilitate a land deal where Hohensee would acquire property at a lower price than what it was worth. (R. 128 at PageID# 1660.) After speaking with Magnoli, O'Leary reached out to the FBI.
>
> In January 2014, the FBI began an investigation of Hohensee. After the FBI obtained evidence of Hohensee accepting bribes, he agreed to cooperate with the FBI. During an interview with the FBI, Hohensee mentioned Defendant Fazal Khan, the owner of a local engineering firm. In May 2014, the FBI opened a bribery investigation into Khan. Over the course of nine months, the FBI tracked Khan, including wiretapping his phone and recording his conversations with others.
>
> Most of the recorded conversations were between Khan and Hohensee. On May 7, 2014, at the behest of the FBI, Hohensee called Khan, and told him that Washington Township was seeking bids for an engineering contract.

---

remains pending on the Court's docket, that filing is also **DENIED** for the reasons explained in this Opinion and Order.

Khan responded: "Can you put me in? I'll take care of everybody in that town." (Gov. Ex. 101 at 0:39–0:43.)

In another recorded conversation between Khan and Hohensee, Khan mentioned that he planned to inform O'Leary that he wanted "to take over the Washington" engineering contract. (Gov. Ex. 102T-01.) At the time, Washington Township had a contract with another engineering firm, Giffels Webster, worth over a million dollars annually. In response, Hohensee requested that Khan "let me do my magic" before Khan reached out to O'Leary. (*Id*.) At a later point, Khan expressed to Hohensee that "we need to work out some details." (Gov. Ex. 104 at 0:16–0:18.) Khan explained that with Giffels Webster charging an estimated one million dollars a year, he would make at least $150,000 profit if he received the engineering contract. Khan then suggested that Hohensee would receive a kickback from that profit if he received the contract and told him that nobody would know about their arrangement.

In yet another recorded exchange between the duo, Khan told Hohensee about a vacant 105 acre property in Washington Township that had a low value due to a lack of water supply. Khan suggested that he would purchase the property along with several other individuals, and as long as Hohensee could "get water there," they would "each make a million dollars." (Gov. Ex. 301-A at 0:46–0:50.) Khan specifically told Hohensee that he did not have to invest any money in the project—his share would be in return for dealing with the water issue.

On June 20, 2014, Hohensee told Khan that "we should plan a trip or something." (Gov. Ex. 201 at 0:00–0:02.) Khan suggested a fishing trip. On August 28, 2014, Hohensee and Khan met up at a local restaurant. Hohensee told Khan that O'Leary was leaving the engineering contract decision up to him. After Hohensee said that he would be announcing a request for proposal, Khan responded, "If you're going to then we need to plan it

3

properly so both of us can make some money." (Gov. Ex. 103T-01.)

At this same meeting, Khan told Hohensee about his arrangements for their fishing trip. He explained that he booked "a high-end resort," and that he was covering all the expenses for the trip. (Gov. Exhibit 204T-02.) Khan also indicated that if they went to the casino, he would provide cash for gambling. He later told Hohensee that he was bringing $1,000 for each of them to use for gambling. Hohensee then told Khan that he was lying to his wife about how he was paying for the trip and asked Khan for cash in advance so he could show his wife that he had the money to cover the trip.

On September 9, 2014, Khan met up with Hohensee, and, as promised, gave him $1,000. Two days later, Khan, Hohensee, and a third individual went on a three day fishing trip, all expenses paid by Khan. After returning from the fishing trip, on September 26, 2014, Hohensee offered to give Khan his gambling proceeds back, but Khan told him to never discuss the trip again.

On October 24, 2014, Hohensee and Khan met up once again. Hohensee informed Khan that he would be retiring but told him, "[D]on't worry. I got you all set up." (Gov. Ex. 105T-01.) Hohensee said he spoke with O'Leary about working with Khan, and said "you're probably going to have to help [O'Leary] out somehow." (Gov. Ex. 105T-02.) Hohensee further told Khan that O'Leary was "looking for about ten grand." (*Id*.) Khan responded, "I'll take care of him. It's a done deal." (Gov. Exhibit 105T-03.)

On November 4, 2014, Khan met with O'Leary. O'Leary expressed to Khan that he would give him the engineering contract but that he was "going to need something too." (Gov. Ex. 106A at 0:10–0:11.) Khan responded, "Whatever you need, it will be taken care of very quietly." (*Id*. at 0:14–0:19.) In a separate conversation, Khan told

4

O'Leary that he would give him 10 percent of the proceeds
from all Township contracts he received. In a video of a
later meeting, Khan can be seen handing O'Leary an
envelope. An FBI agent later testified that there was
$10,000 in cash inside the envelope.

*Khan*, 2021 WL 4026781, at **1-2.

## B

On September 13, 2017, the Government charged Khan with four counts of
theft or bribery concerning programs receiving federal funds in violation of 18
U.S.C. § 666(a)(2). (*See* Third Superseding Indictment, ECF No. 28.)  Each Count
involved a different alleged bribe:

- Count 1 arose out of the events of November 12, 2014.  This Count alleged
  that Khan corruptly gave and offered to give an agent of Washington
  Township (O'Leary) $10,000 cash with the intent to influence and reward
  O'Leary. (*See id.*, PageID.120-121.)

- Count 2 arose out of the events of September 9, 2014.  This Count alleged
  that Khan corruptly gave and offered to give an agent of Washington
  Township (Hohensee) $1,000 cash with the intent to influence and reward
  Hohensee. (*See id.*, PageID.121.)

- Count 3 arose out of the all-expenses-paid fishing trip that Khan gave
  Hohensee on September 11, 2014.  This Count alleged that Khan corruptly

5

paid for Hohensee's fishing trip with the intent to influence and reward Hohensee. (*See id*.)

- Finally, Count 4 arose out of Khan's offer to give Hohensee an interest in the vacant 105-acre property in Washington Township without having to put any money down. This Count alleged that Khan corruptly offered to give Hohensee a secret financial interest in that development deal with the intent to influence and reward Hohensee. (*See id*., PageID.122)

Khan pled not guilty on all four Counts. At trial, Khan's defense was entrapment. (*See* 7/12/2019 Trial Tr., ECF No. 126, PageID.1481.) He admitted that he had paid money and offered property deals to Hohensee and O'Leary. (*See id*.) However, Khan claimed he only did so because they obstructed and delayed his engineering projects, and he believed that the only way to proceed with his projects was to pay the bribes. (*See id*. at PageID.1490.) As his lawyer explained to the jury at trial:

> We [are] talking about the obstacles and the impediments to the completion of the job as an issue of vulnerability for Mr. Khan that the Government exploited. And they continued to exploit it for months. Okay? One after another after another, and issues were raised, and time is taking its toll. The expenses are taking its toll.

(*Id.*)

The jury convicted Khan on all four counts. (*See* Verdict Form, ECF No. 104.) Judge Cleland then sentenced him to 132 months of imprisonment.[2] (*See* Judgment, ECF No 150, PageID.2436.)   Khan thereafter filed a direct appeal, and the Sixth Circuit affirmed his conviction and sentence. *See Khan*, 2021 WL 4026781, at *1.

## C

Now before the Court is Khan's motion to vacate his sentence under 28 U.S.C. § 2255. (*See* Mot., ECF No. 170.)  Khan seeks relief on the basis of that his retained trial attorney failed to provide effective assistance of counsel.  More specifically, he claims that his trial counsel failed to seek admission at trial of important evidence – audio recordings of conversations between Khan and Hohensee, emails between Government agents and cooperating witnesses, and an alleged invoice that Khan mentioned during his trial testimony (collectively, the "Omitted Evidence") – that Khan insists would have substantially strengthened his entrapment defense. (*See* Br., ECF No. 170-1.)  He argues that if this evidence had been admitted, there is a reasonable probability that the outcome of his trial would have been different. (*See id*.)

---

[2] This Court recently reduced Khan's sentence to 121 months imprisonment in accordance with retroactive amendments to the United States Sentencing Guidelines. (*See* Order, ECF No. 188.)

## II

## A

In order to prevail on his claim of ineffective assistance of trial counsel, Khan "must prove (1) that his trial counsel's representation 'fell below an objective standard of reasonableness,' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984)).

Khan contends that his trial counsel's alleged ineffectiveness undermined his viable entrapment defense. In order to properly evaluate that claim, it is essential to understand the elements of an entrapment defense. The Sixth Circuit set forth those elements and offered an explanation of them in Khan's direct appeal:

> An entrapment defense "requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *Khalil*, 279 F.3d at 364 (citing *United States v. Nelson*, 922 F.2d 311, 317 (6th Cir. 1990)). "An 'inducement' consists of an 'opportunity' plus something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *United States v. Hood*, 811 F. App'x 291, 298 (6th Cir. 2020) (citing *United States v. Dixon*, 396 F. App'x 183, 186 (6th Cir. 2010)). "[M]erely afford[ing] an opportunity or facilities for the commission of the crime" is not enough. *Mathews v. United States*, 485 U.S. 58, 66 (1988)). Thus, the government's suggestion that the defendant commit the crime does not suffice to establish government

8

inducement. *See United States v. Sadiqullah, — F. App'x — ,* 2021 WL 3043271, at *6 (6th Cir. July 20, 2021). "Predisposition . . . focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (internal quotations and citations omitted). It is "by definition, the defendant's state of mind before his initial exposure to government agents." *United States v. McLernon*, 746 F.2d 1098, 1112 (6th Cir. 1984) (internal quotations and citation omitted). In determining whether a defendant was predisposed to commit the crime, we weigh:

> [1] the character or reputation of the defendant, including any prior criminal record; [2] whether the suggestion of the criminal activity was initially made by the Government; [3] whether the defendant was engaged in the criminal activity for profit; [4] whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and [5] the nature of the inducement or persuasion supplied by the government.

> *Khalil*, 279 F.3d at 365 (quoting *United States v. Barger*, 931 F.2d 359, 366 (6th Cir. 1991)). "The most important factor in determining the lack of predisposition . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements." *McLernon*, 746 F.2d at 1113 (internal quotations and citation omitted).

*Khan,* 2021 WL 4026781, ** 4-5.   When a defendant asserts entrapment as a defense, the burden is on the Government to prove beyond a reasonable doubt that there was no entrapment.  *See United States v. Jones,* 575 F.2d 81, 83 (6th Cir. 1978).

9

**B**

Khan is not entitled to relief because he has failed to show that he suffered prejudice as a result of his trial counsel's allegedly deficient performance.[3]   As explained below, there is no reasonable probability that the outcome of Khan's trial would have been different if his trial counsel had secured admission of the Omitted Evidence.  The Court will therefore deny Khan's motion.

**1**

In assessing the potential impact that the Omitted Evidence would have had at trial, it is helpful to begin by reviewing the strength of Khan's entrapment defense as it was presented to jury.  If the defense had real merit as presented, then there would be greater reason to believe that the Omitted Evidence could have made a difference and could potentially have led the jury to accept the entrapment defense. In contrast, if the defense as presented to the jury lacked significant evidentiary support, there is less reason to believe that the Omitted Evidence may have changed the result at trial.

The Court's review of the trial record reveals that the entrapment defense was weak.   Indeed, the Government presented very strong evidence to negate both

---

[3] Because the lack of prejudice, standing alone, is fatal to Khan's request for relief, the Court need not independently review Khan's contention that his trial counsel's performance was deficient. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). !

elements of the defense.  As the Sixth Circuit explained on direct appeal, with respect to the inducement element, the Government presented a "wealth of recordings" which "demonstrate[d] that the [G]overnment did nothing more than provide Khan with an opportunity to engage in bribery." *Khan*, 2021 WL 4026781, *5.  These "extensive recordings show[ed] Khan's initiation of, and eagerness to engage in, the bribery schemes," and the recordings persuasively demonstrated that the Government did not induce Khan to commit bribery. *Id*.  Likewise, the recordings were powerful evidence of Khan's predisposition to commit bribery.  As the Sixth Circuit emphasized, "the recordings demonstrate[d] that the four charged briberies were all schemes suggested by Khan, he engaged in the briberies for the purpose of making a profit, [and] he did not exhibit any reluctance to commit the crime." *Id*.  Khan's predisposition was further demonstrated by "recordings show[ing him] bragging about uncharged bribes to public officials." *Id*. at *6.

Moreover, Khan's entrapment defense suffered from a fundamental problem of timing.  As Khan's post-conviction counsel acknowledged at the hearing before the Court on the pending motion, the essence of Khan's entrapment defense was that he resorted to offering payments to Hohensee and O'Leary only *after (and because)* he (Khan) realized that those two officials were intentionally obstructing his projects in Washington Township. As Khan's post-conviction counsel further acknowledged,

11

Khan came to that realization *in the summer of 2014*.[4]  The problem for Khan is that he was bragging about paying bribes – and thus showing a predisposition to pay bribes to O'Leary and Hohensee – *before* that time.  For instance, the Government presented evidence that in early May of 2014:

- Khan had promised to "take care of everyone in town" if Hohensee could get him an engineering contract with Washington Township.[5] (*See* Trial Ex. 101T, p.1; ECF No. 176-2, PageID.2929.)

- Khan offered Hohensee a 1/5th interest in a business with no money down in exchange for helping Khan take over a water project. (*See* Trial Ex. 301T, p.4-5, ECF No. 176-12, PageID.2968.)

---

[4] During the hearing, Khan's post-conviction counsel confirmed that Khan did not "come[] to [the] understanding" that his projects were being intentionally obstructed "until the June, July, August [of 2014] timeframe." (A final transcript of the hearing before the Court has not yet been prepared.  The quotes attributed to Khan's post-conviction counsel come from the Court's notes.  The Court is confident that the quotes will appear in the final version of the transcript.)  The parts of Khan's trial testimony in which he indicates that came to believe that his projects were being obstructed in the summer of 2014 came at, among other places, pages 179, 183-184 of the trial transcript for July 11, 2019, and page 35 of the trial transcript for July 12, 2019. (*See* 7/11/2019 Trial Tr., ECF No. 125, PageID.1352, 1356-1357; 7/12/2019 Trial Tr., ECF No. 126, PageID.1487.)

[5] During the hearing before the Court, Khan's post-conviction counsel suggested that this statement by Khan was mere "puffery" and that Khan had no real intent to make payments in exchange for the engineering contract.  However, on cross-examination at trial, Khan conceded that when he made this statement, it was an offer to "pay public officials to get that contract." (7/11/2019 Trial Tr., ECF No. 125, PageID.1375.)

- Khan bragged about previously bribing people in other municipalities. (*See* Trial Ex. 400T, pp. 1-2, ECF No. 176-16, PageID.2986-2987.)

Simply put, Khan's own conduct and statements show that he was predisposed to pay a bribe *before* he claims to have realized that there was a concerted effort to obstruct his projects.

Khan's entrapment defense was also hobbled by the fact that none of the pressure Hohensee allegedly applied to Khan was captured on the many audio recordings of the conversations between Hohensee and Khan. Instead, according to Khan, all of the pressure was applied during conversations that, it just so happens, were not recorded. That stark coincidence was surely not lost on the jury. Indeed, Government counsel effectively exploited this coincidence during his cross-examination of Khan. (*See* 7/11/2019 Trial Tr., ECF No. 125, PageID.1378-1379, 1380-1381.)

Finally, the Government's cross-examination of Khan was devastating. The effectiveness of that questioning leaps off the page of the trial transcripts. By way of example, the Government got Khan to concede that in early May of 2014 (the same month the FBI opened its investigation into him), he promised to "happily pay" public officials in order to win an engineering contract, despite no evidence of anyone demanding such payments from him. (*Id.*, PageID.1374-1376.) Likewise, the Government confronted Khan with multiple recordings that showed, among

other things, Khan offering Hohensee a free interest in an engineering contract of which "nobody will know" (Trial Ex. 104T, ECF No. 176-5, PageID.2934-2935), Khan agreeing to pay O'Leary $10,000 in exchange for an engineering contract (Trial Ex. 105T, ECF No. 176-6, PageID.2938-2939), and Khan calling himself an "expert" at bribing public officials (Trial Ex. 106T, ECF No. 176-7, PageID.2945), and  Khan failed to offer reasonable explanations for any of these inculpatory recorded statements.

For all of these reasons, Khan's entrapment defense at trial was weak, and there is little, if any, chance that the jury would have accepted the defense without substantial additional and persuasive evidence to support both prongs of the defense.

## 2

The Omitted Evidence, if admitted at trial, would not have provided meaningful support to Khan's entrapment defense, and there is thus no reasonable probability that the result of Khan's trial would have been different if his trial counsel had secured admission of that evidence.  Accordingly, Khan cannot show prejudice from his trial counsel's failure to present the Omitted Evidence to the jury.

The Court separately addresses below the three categories of Omitted Evidence.

**a**

The Court begins with the audio recordings that Khan's trial counsel did not seek to admit.  The recordings in question capture conversations between Khan, Hohensee, and others.  Transcripts of the recordings appear in the record at ECF No. ECF No. 170-3, PageID.3295-3306.  Khan's theory is that the recordings provide substantial support for his entrapment defense because they show that Hohensee induced him to pay the bribes by obstructing his projects.

The Court has carefully reviewed the transcripts of the recordings and disagrees with Khan's characterizations of the captured communications.  During the recorded conversations between Khan and Hohensee, Hohensee does not come across as someone who is interfering with Khan's projects or doing anything to induce the payment of a bribe.  On the contrary, Hohensee comes across more as an ally of Khan who is trying to help Khan figure out a path forward for completion of Khan's projects.  Indeed, during the hearing before the Court, Khan's post-conviction counsel acknowledged that Hohensee's "general tone" during these conversations was that Hohensee was Khan's "buddy."  And during that same hearing, Khan's post-conviction counsel was not able to direct the Court to any specific portion of the unadmitted recordings during which Hohensee was pressuring Khan, interfering with Khan's projects, or otherwise inducing Khan to pay a bribe.  Finally, many of the excerpts of the unadmitted recordings that Khan highlights in

his brief are statements *he made to Hohensee* complaining that others are delaying his projects, not statements by Hohensee threatening to do so. (*See* Br., ECF No. 170-1, PageID.3264-3265.)  In short, Khan has failed to show that the unadmitted recordings would have supported his contention that Hohensee induced him to pay the bribes by obstructing his projects.

Likewise, Khan has not shown that the unadmitted recordings reflected any lack of predisposition on his part to pay bribes.  During the hearing before the Court, the Court asked Khan's post-conviction counsel to identify the portion of the recordings that show such a lack of predisposition.  That counsel directed the Court to a portion of the recordings in which Khan says that he does things the "right way." But as Khan's post-conviction counsel thereafter acknowledged, that statement by Khan related to doing project work in the field without taking shortcuts and did not relate to following the law.  The omitted recordings simply do not reflect a lack of predisposition by Khan to pay bribes.

In sum, the omitted recordings do not contain any persuasive evidence that would have supported either element of Khan's entrapment defense, and thus there is no reasonable probability that Khan would have prevailed on that defense if his trial counsel had secured admission of the recordings.

**b**

The Court next turns to the unadmitted emails.  Khan's briefing focuses on three of them.  The first is an email exchange between Ted Brzezinski and O'Leary dated October 14, 2014. (*See* email, ECF No. 179-1, PageID.3083.)  Brzezinski was the FBI Special Agent who was originally in charge of the investigation into Khan.  In one portion of the October 14 email exchange, O'Leary describes a statement made to him by Bob Walz, an engineer for Washington Township.[6] (*See id*.)  According to O'Leary, Walz said that Khan said that Hohensee threatened to hold up some of Khan's projects if Khan did some surveying work that Hohensee did not want Khan to do. (*See id*.)  Khan argues that this email would have had a "powerful impact" at trial because it would have "accomplished" three things for the defense.

---

[6] The email does not cleanly separate the portions written by Brzezinski from the portion written by O'Leary.  But it is possible to determine which man wrote which portion.  The body of the email – beginning with the words "A couple of things" and ending with the words "This has to end" – was clearly written by O'Leary.  That portion of the email references "firing" Hohensee and another man who worked for Washington Township, and only O'Leary would have been in a position to do that.  O'Leary was the Washington Township Supervisor; Brzezinski was an FBI Agent who obviously lacked the authority to make personnel decisions for the Township.  The one line in the email written by Brzezinski appears at the very top of the text and states: "I just tried to call you and says # disconnected … Please call me 3137437830… you got this wrong Dan.  We need to talk please."

(Br., ECF No.170-1, PageID.3274.)   For the reasons set forth below, the Court disagrees.

Khan first says that this email would have "definitively corroborated [his] testimony that Hohensee threatened to hold up [his (Khan's)] projects." (*Id.*)   The Court, however, views any possible corroboration from the email as less than "definitive."   The statement in the email that Hohensee threatened to hold up Khan's projects was buried in several levels of hearsay.   More importantly, that statement came from Khan, himself – he was the one noted in the email as saying that Hohensee threatened him.   And as the Government's trial evidence and blistering cross-examination of Khan revealed, there are substantial reasons to question the veracity of any statements made by Khan.   Indeed, the author of the email, O'Leary, did not even accept the statements attributed to Khan at face value.   He said in the email that certain steps would have to be taken "*IF* KHAN IS TELLING THE TRUTH…." (Email, ECF No. 179-1, PageID.3083; capitalization in the original, emphasis added.)   Simply put, the statement attributed to Khan in the October 14 email – unlike, say, an account of Hohensee applying pressure from an independent witness or a written or recorded statement by Hohensee applying such pressure – fell far short of "definitive" corroboration of Khan's claim that Hohensee was pressuring Khan.

Khan next argues that the October 14 email would have "discredited the testimony of law enforcement that there was no evidence of Hohensee holding up [his (Khan's)] projects." (Br., ECF No. 170-1, PageID.3274.) The testimony to which Khan refers here is testimony by FBI Special Agent Robert Beeckman that he (Beeckman) was not aware of any evidence that Hohensee was delaying Khan's work. (*See id.*, PageID.3257, quoting 7/10/2019 Trial Tr., ECF No. 124, PageID.1130.) Khan's theory is that the email showed that Hohensee *was* delaying projects, that Beeckman was aware of the email, and that admitting the email would thus have discredited Beekman's testimony. But for all of the reasons explained above, the email was not evidence that Hohensee was actually delaying Khan's projects; at best, it was evidence that Khan was *telling people* that Hohensee was doing so. Thus, the email would not necessarily have undercut Beeckman's testimony.

Khan finally says that the October 14 email would have "shown that Hohensee was not recording all of his meetings with Mr. Khan." (Br., ECF No. 170-1, PageID.3274.) Making such a showing would have been important, Khan argues, because, as noted above, his theory at trial depended upon the jury believing that Hohensee had applied pressure to him (Khan) during unrecorded conversations. But, again, for all of the reasons explained above, the email was not persuasive evidence that Hohensee actually had unrecorded conversations with Khan. At most,

the email reflected Khan reporting that Hohensee made certain threats during a conversation that went unrecorded. The email falls far short of independent, trustworthy evidence that Hohensee was not recording all of his communications with Khan. Thus, the October 14 email would not have lent substantial support to Khan's entrapment defense.

The second unadmitted email is dated January 25, 2015. (*See* email, ECF 179-1, PageID.3084.) Khan offers a one sentence of analysis of this email. He says that it "shows extensive planning by O'Leary and Agent Brzezinski in an attempt to deceive Mr. Khan." (Br., ECF No. 170-1, PageID.3274.) But it was no secret that O'Leary was cooperating the Government, and thus his coordination with Brzezinski does not add much, if anything, to Khan's entrapment defense. Khan suggests that the purported deception in the January 25 email somehow undermines the Government's contention that Khan was a willing bribe payer, but he does not sufficiently explain why that is so. For instance, he makes no showing that anything in January 25 email evidences that Khan was deceived *into paying bribes*. Simply put, he does not directly (or sufficiently) tie the alleged deception reflected in the email into either prong of his entrapment defense. He has therefore failed to show a reasonable probability that the admission of the January 25 email into evidence would have changed the result at trial.

The third email is from O'Leary to Brzezinski dated February 8, 2015. (*See* email, ECF No. 179-1, PageID.3085.)   In that email, O'Leary refers to money that "you [Brzezinski] had me [O'Leary] *take* from him [Khan]." (*Id*.; emphasis added.) According to Khan, that statement supports his contention that O'Leary was compelling Khan to pay bribes to get his projects moving.  While that interpretation of O'Leary's language is not entirely unreasonable, the email is not particularly strong evidence that O'Leary was pressuring Khan to make payments.  O'Leary's use of the phrase "had me take from" Khan strikes the Court as somewhat ambiguous.  It is not clear to the Court, as Khan insists, that the email is an admission by O'Leary that he coerced and/or induced Khan into making payments.  The email could just as easily be read as O'Leary saying that the FBI directed him to accept payments from Khan when offered and/or delivered by Khan.  In any event, although though there may be one interpretation of this email that could have provided some potential support to Khan's entrapment defense, the Court cannot conclude, based upon the Court's review of the entire record, that there is a reasonable probability that the result of the trial would have been different if trial counsel had secured admission of this email.

**c**

Last, the Court addresses the unadmitted invoice.  Some background is necessary to understand Khan's argument with respect to this piece of unadmitted evidence.

As noted above, the Government presented evidence at trial that Khan gave Hohensee $1,000 in cash in connection with the fishing trip that they took together. The Government further contended that two days after Khan learned that he was under federal investigation, he attempted to cover-up the unlawful payment to Hohensee. (*See* 7/11/2019 Trial Tr., ECF No. 125, PageID.1410.)  According to the Government, Khan did that by issuing Hohensee a check for $540.84 and writing the following on the bottom of the check (in what was effectively the "memo" line of the check): "Inv. No. 1 (this INV. $1580.84 minus 1,000 equals $540.84.)." (Trial Ex. 213, p.2, ECF No. 176-14, PageID.2984.)  The Government's theory was that Khan was attempting to portray the earlier $1,000 cash payment as partial payment for legitimate services that Hohensee had provided to Khan (and for which Hohensee had invoiced Khan), not as the payment of a bribe.

When the Government questioned Khan at trial about the timing of the check – asking Khan if it was just a "wild coincidence" that Khan wrote the check a mere two days after learning that he was under investigation – a juror asked if there was an "invoice date" for the invoice referenced on the check (as "INV."). (7/11/2019

Trial Tr., ECF No. 125, PageID.1437.)  Judge Cleland then reviewed the check and asked Khan's trial counsel if the reference to an "invoice" on the check was "the only reference to invoice." (*Id*.)  Khan's lawyer said: "yes." (*Id*.)  The Government then suggested to Khan on cross-examination that "there [really] was no invoice." (*Id.*, PageID.1440.)  Khan replied that "[t]here in an invoice.  There is a copy.  I gave it to my counsel." (*Id*.)

The issue of the invoice never arose again at trial.  Khan's trial counsel did not offer an invoice into evidence at trial.  And the Government did not make any other references to an invoice or the lack thereof.

It turns out that Khan's trial counsel did have an invoice. (*See* Invoice, ECF No. 170-7, PageID.3313.)  The invoice is from "Steven Hohensee, LLC" in the amount of $1,540.84. (*Id.*)  It is undated.

Khan argues that he suffered substantial prejudice as a result of his trial counsel's failure to secure admission of the invoice.  He first suggests that the importance of the invoice is obvious because "[t]he jury specifically asked about it, and the Court inquired about it." (Br., ECF No. 170-1, PageID.3276.)  But the jury asked about the date of the invoice (*see* 7/11/2019 Trial Tr., ECF No. 125, PageID.1433), and it is undated.  Thus, admission of the invoice would not have addressed the jury's concerns.  And Judge Cleland's lone question concerning other

references to an invoice did not unfairly magnify the importance of the invoice issue – especially considering that the issue was never raised again by either side.

Khan also argues that admission of the invoice "was essential to counter the Government's assertion that Khan was lying about its existence." (Br., ECF No. 170-1, PageID.3276.)  However, while it may have been useful for Khan to rebut the inference that he was lying about the invoice, there is no reasonable probability that the result of the trial would have been different if trial counsel had secured admission of the invoice.  Simply put, the invoice issue was a small piece of the overall trial and of the Government's cross-examination of Khan.  As noted above, the issue was never raised again at trial after the Government briefly touched upon it during cross-examination.  And the Government's cross-examination and arguments to the jury hammered Khan's credibility on myriad other points.  This Court has no doubt but that the jury would have rejected Khan's entrapment defense even if Khan had shown the jury the invoice from Hohensee that his trial counsel failed to present at trial.

### d

For all of the reasons explained above, Khan has failed to show a reasonable probability that the result of his trial would have been different if his trial counsel had secured admission of the Omitted Evidence.  He is therefore not entitled to relief on his claim of ineffective assistance of counsel.

While the Court's analysis above focuses on each piece of Omitted Evidence independently, the result is the same when the Court considers the cumulative effect that the Omitted Evidence would have had on the jury if all of it had been admitted at trial. There is no reasonable probability that the jury would have accepted Khan's entrapment defense if it had seen the entire body of Omitted Evidence. As repeatedly emphasized above, the Government's evidence on both prongs of the entrapment defense was strong, the entrapment defense was deeply flawed from its inception, and the Omitted Evidence, considered as a whole, would not have meaningfully "moved the needle" with respect to that defense.

### III

Khan may not appeal the Court's decision unless the Court issues him a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22. A court may issue a Certificate of Appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That standard is met when "reasonable jurists could debate whether ... the [claim] should have been resolved in a different manner." *Welch v. United States*, 578 U.S. 120, 127 (2016) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Here, reasonable jurists would not debate the Court's conclusions that Khan failed to show prejudice from his trial counsel's alleged ineffectiveness and that he is therefore not

entitled to relief on his claim of ineffective assistance of counsel.  Thus, the Court

declines to issue Khan a Certificate of Appealability.

## IV

For all the reasons explained above, (1) Khan's motion to vacate his sentence

(ECF No. 170) is **DENIED** and (2) a Certificate of Appealability is **DENIED**.

**IT IS SO ORDERED.**[7]

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 28, 2024

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on June 28, 2024, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

---

[7] As the Court was preparing this Opinion and Order, the Court encountered technical difficulties accessing Khan's motion as filed on the docket at entry numbers 170 and 171. The Court therefore asked Khan's counsel to refile the motion on the docket, and he did so. (*See* ECF No. 190.)  Shortly thereafter, the Court resolved the technical issues and was able to access the motion as originally filed. The refiled motion at docket entry 190 can therefore be ignored.